AO 91 (Rev. 08/09)  Criminal Complaint

United States District Court
Southern District of Texas
FILED

# UNITED STATES DISTRICT COURT

### for the

### Southern District of Texas

JUL – 9 2013

David J. Bradley, Clerk

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) |
| Lorena Nohemi GARCIA | ) |
| YOB: 1987 | ) |
| COB: USA | ) |
| *Defendant(s)* | |

Case No.  M-13-1218-M

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___July 8, 2013___ in the county of ___Hidalgo___ in the
___Southern___ District of ___Texas___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 USC 841(a)(1) | Knowingly and Intentionally Possess With Intent to Distribute a Controlled Substance/Approximately 3.62 Kilograms of Methamphetamine, a Schedule II Controlled Substance under the Controlled Substance Act. |
| 21 USC 952 | Importation of a Controlled Substance/Approximately 3.62 Kilograms of Methamphetamine, a Schedule II Controlled Substance under the Controlled Substance Act. |

This criminal complaint is based on these facts:

On July 8, 2013, United States Immigration and Customs Enforcement, Homeland Security Investigations, Office of the Assistant Special Agent in Charge, McAllen, Texas responded to the Hidalgo, Texas Port of Entry and initiated a narcotics investigation after U.S. Customs and Border Protection Officers seized approximately 3.62 kilograms of a substance which field tested positive for the properties of methamphetamine.

✔ Continued on the attached sheet.

approved for filing

Aug

_____
*Complainant's signature*

Ryan Serge, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___July 9, 2013  8:40 a.m.___

_____
*Judge's signature*

City and state:  ___McAllen, Texas___

Peter Ormsby, U.S. Magistrate Judge
*Printed name and title*

ATTACHMENT A

On July 8, 2013 at approximately 12:40 hours, HSI Special Agent R. Serge was contacted by U.S. Customs and Border Protection Officers (CBPOs) at the Hidalgo, Texas Port of Entry (Hidalgo POE) and advised of the following facts:

At approximately 11:58 hours, a green Chevrolet Camaro displaying Texas plate BSX8153, driven by Lorena Nohemi GARCIA, attempted to make entry through the Hidalgo, Texas POE. GARCIA gave a negative declaration to CBPO I. Barbosa. GARCIA stated she crossed into Mexico to pick up the vehicle at a mechanic shop and was bringing the vehicle back for GARCIA's friend, who was unable to pick up the vehicle due to work. After subsequent questioning, CBPO I. Barbosa referred the subject and vehicle to CBP secondary for further inspection.

While in secondary, CBPO R. Garcia received another negative oral declaration from GARCIA. GARCIA stated that the vehicle belonged to her friend. When asked how GARCIA knows the friend, GARCIA stated the vehicle owner was a friend of a friend. GARCIA stated she was entering the United States to go to Whataburger. CBPO R. Garcia noticed GARCIA seemed nervous and was unable to provide a concrete itinerary.

Canine Enforcement Officer (CEO) E. Gonzalez later inspected the vehicle in secondary along with his K-9 partner "Leika" CG-44. CEO E. Gonzalez notified CBPO R. Garcia that K-9 "Leika" had given a positive alert to the front left of the vehicle in the engine area. CBPOs noticed the intake manifold of the engine displayed signs of recent work.

CBPOs subsequently extracted one (1) package containing a substance that field-tested positive for the properties of methamphetamine.

At approximately 14:12 hours, HSI SA R. Serge, HSI SA M. Kehoe, and CBPO Hernandez conducted an interview of GARCIA. CBPO Hernandez read GARCIA her rights via a Department of Homeland Security Declaration of Rights form in GARCIA's native language of Spanish, as witnessed by HSI SA R. Serge and M. Kehoe. GARCIA waived her rights both orally and in writing and wished to speak with agents without the presence of an attorney.

GARCIA provided agents with conflicting statements regarding arriving to the Hidalgo POE. GARCIA initially stated that the vehicle was driven to the point in which one pays to enter the United States. GARCIA stated that the driver exited the vehicle and GARCIA entered and drove the vehicle through the Hidalgo POE. Later in the interview, GARCIA stated the vehicle was brought to her residence in Mexico. GARCIA stated she was driven until they approached the Hidalgo POE, at which point GARCIA took over driving.

GARCIA gave a number of conflicting statements regarding the delivery of the vehicle. GARCIA initially stated to agents that she was driving the vehicle into the United States for a friend and that GARCIA was to deliver the vehicle to the friend's girlfriend but did not provide agents with any details regarding this plan. Later in the interview, GARCIA stated that the vehicle belonged to the girlfriend's husband. Later in the interview, GARCIA stated she was going to leave the car in a nearby parking lot.

ATTACHMENT A

GARCIA gave a number of conflicting statements regarding her itinerary in the United States. GARCIA initially stated the purpose for her trip was to buy shoes for her son.  Later in the interview, GARCIA stated she was going to buy five (5) hamburgers and then return to Mexico to take a taxi back to her residence.   Later in the interview, GARCIA stated she was going to buy five (5) hamburgers and meet her friend and another individual at a pharmacy across the street in Mexico and then take a taxi back to her residence for approximately eight (8) pesos.

GARCIA estimated shoes to cost approximately $7.95, but GARCIA never provided agents with details regarding buying shoes for her son.  When agents confronted GARCIA about this, GARCIA still failed to provide agents with any details or plans for purchasing shoes.

GARCIA gave a number of conflicting statements regarding GARCIA's friend that asked GARCIA to drive the vehicle into the United States.  GARCIA initially stated this individual was a friend.  Later in the interview, GARCIA stated this individual was her neighbor.  Later in the interview, GARCIA stated she had only met this individual on six (6) or seven (7) occasions. Later in the interview, GARCIA stated the individual isn't her neighbor but used to be.

GARCIA initially stated she doesn't know what this individual does for a living.  Later in the interview, GARCIA stated the individual used to work security for a casino but that the casino had closed.  Later GARCIA stated this individual had spent time in a Texas prison until the individual escaped.

GARCIA stated her friend took her $20 bill and gave her a $100 bill to buy five (5) hamburgers. GARCIA stated she was going to buy the same type of hamburgers.  Later in the interview, GARCIA stated the hamburgers were going to have different toppings.  GARCIA estimated the hamburgers to cost approximately $2.  GARCIA stated she wasn't going to keep the change. GARCIA stated she was only going to keep her $20, which contradicted her claim that she was going to purchase shoes.

GARCIA stated the cellular telephone she was using was not hers.  GARCIA stated that an individual whom GARCIA knows, gave GARCIA the cellular telephone before entering the United States.  GARCIA stated that all of the contacts in the cellular telephone are GARCIA's friend's and not GARCIA's.

GARCIA stated she realized it was suspicious that her friend had a large amount of money that he gave GARCIA.  When questioned regarding the suspiciousness of this activity, GARCIA stated she began believing something wasn't right as she waited in line at the Hidalgo POE. GARCIA stated she noticed that the car was clean and lacked any personal items, however, GARCIA continued into the Hidalgo POE and didn't alert CBPOs to her suspicions at primary or secondary inspection.

GARCIA stated that if the vehicle had been driven to the parking lot, someone would have picked it up.  GARCIA stated if she knew the individual on the United States side, she would tell agents.